Good morning. My name is Mara Goldman. I'm here on behalf of Alejandro Toledo, who is the petitioner appellate, and I'm hoping to reserve five minutes for rebuttal. The extradition treaty between the United States and Peru requires two things before Peru can extradite Dr. Toledo. One is that he actually be charged with a crime. The other is that Peru produces a copy of the actual charging document. Here, neither of those has occurred. Here's what we know. As I said, the treaty forbids extradition unless the person has been charged. And among the documentary requirements are the requirement that the requesting country produce a copy of the charging document. We also know, because the government has conceded it in their answering brief, that a charge is a formal accusation. We also know, because the extradition— Can I—what is that formal—you said it was a formal what now? Accusation. A formal accusation. Where does that come from? The government took it from Black's Law Dictionary, but it is also consistent with case law in this circuit as well as other circuits. But a formal accusation, does that necessarily mean it has to be—I mean, here's the tough thing. We're trying to figure out what Peruvian criminal law is, and it sounds like there's some differences in how Peruvian criminal law proceeds as opposed to U.S. criminal law. So, I mean, when you read charged in the U.S., you'd think, well, maybe it has to be an indictment. But it sounds like that's not necessarily true in Peru. Well, it's not called an indictment, but it is true that in Peru, as in the United States, there is a specific recognized formal charging document. And that document is the order of prosecution. That is what the extradition court found to be the case, that there is only one formal charging document. It is the one recognized in Peru's Code of Criminal Procedure, and that is— So the district court did say that, but didn't give a cite for it. And then your brief cited the district court, I think, if I'm remembering correctly. And it seems like there's also this other document, the accusacion fiscal. And I just don't understand why that couldn't also be considered a formal enough charging document. Well, the support for the court's finding was partly looking at the Code of Criminal Procedure and also looking at an affidavit that—affidavits that Dr. Toledo submitted from experts on Peruvian law, which stated that in their system, the formal charges are brought in the order of prosecution. And did they say, and the accusacion fiscal is X instead? Yes. Can you point me to where that is? I believe that would be in those same declarations. So that—just give me a moment. That would be something that I would have to find. Oh, here. 2ER254 is the Aguirre Declaration, which explains the way that the criminal process moves forward in Peru. And where the accusation comes in is after the prosecutors have done their preliminary investigation and made a decision that they want to seek charges, request permission to charge someone, they submit the accusation to the court. So, okay, I think if I'm right, and please correct me, maybe I'm wrong, but so I think paragraph 8 says he has not been formally charged, but wasn't this written before the accusation—I don't know how to say this word—accusacion issued? It was, but I think that what this says, which remains true regardless, is that where the accusation comes in is to move the case to the intermediate stage, which is where prosecutors are asking the court to charge someone, but the court has not yet made its decision, and that is where we still are in this case. Well, so along those lines, this is a different process than you see in the United States. This next step also allows the accused, Toledo, to actually appear, correct? He may, but he's not required to. Well, isn't it a little bit inconsistent to say that he's not charged, but he can appear and we're going to allow him to remain out of the country? I mean, isn't the whole idea that he has now been charged with something, it's going to be presented to the court, and he has the ability to appear on his own behalf? I don't think that that makes it a formal charge. I think that the presenting to the court is an opportunity for— it's kind of akin to a preliminary hearing, but it's not the trial. It's not a determination of whether or not he is guilty of a crime. It's a determination of whether or not he can be charged. Maybe I could—I had a similar question, so let me try to rephrase it. So if the Peruvian system is such that after this accusacion, now there's a stage where he could appear in court, why shouldn't we interpret the treaty as anticipating that that's when he needs to go back because that's when he might need to be part of the proceedings in Peru? Well, I don't think there's anything in the treaty that says that, and I would say that even if that were the case, then I think the situation is what we have here, which is that it's been six years. There has been no hearing. There still has not been an opportunity for him to appear. Even if he were in Peru, he could not appear right now. He would still have to wait for the judge to decide to proceed to the preliminary hearing. So I think even if that is the point at which he would become charged, we aren't there. And I think that the appropriate thing would be for Peru to wait until he has actually been charged and then submit a new request for extradition. Peru doesn't seem to take that view, though. I mean, they clearly think this falls under the treaty. Yes, that's true. And so why wouldn't we defer to them? I mean, we are not experts of Peruvian criminal law, so why shouldn't we? I think our case law is pretty clear on that, that we do defer to the foreign country, as long as it's within reason, obviously. To a degree, but we certainly cannot 100% defer. I mean, the court and our system here has to play an independent role and make its own determination. And I think that most of the case law is very clear in distinguishing between, for example, we are not going to get involved into the details of, was this arrest warrant validly obtained? But we are going to look at the question of, is this an arrest warrant? Does this qualify under the treaty? And I think it's the same here. It is the court's responsibility here to say, has he been charged? Is this a charging document? And I would say, especially since in this case, the extradition court has made a determination that this is the formal charging document, which is, I think, a determination that this court should defer to under a clearly erroneous standard. So what's your case law that would say that an accusation on its own cannot be a, cannot satisfy the treaty obligations of being charged with a crime? Well, I don't have a specific case, of course, addressing this specific issue. But what we do have is we have the cases that primarily the government is relying on, Imami and Sarsen, and both of those cases talk in terms of a formal charge and whether or not a formal charge is required. And in both cases, they say these treaties that they were construing do not require a formal charge because they do not require a copy of the charging document. And here we have a treaty which was negotiated after and in light of those cases, which says that you do need a copy of the charging document. And I think that given the repeated references in those cases to formal charges, the logical construction is that that is what the charging document calls for, is a formal charge. Can I ask you about the stay motion? Sure. So, okay. So say we just disagree with what you just said. Yes, there needs to be some sort of formal charging document, but we think it could be the accusation. If we think that's true, you're going to lose. But maybe we think it's close. Could we grant the stay if we've already decided you lose? I think yes, for a couple of reasons. One is because it is a balancing test, and so no one factor is going to be determinative. I think that if it's very close on the merits and, in addition, it weighs heavily in terms of harm, then, yes, a stay is appropriate. And I think it also, frankly, would serve the public interest to resolve these issues for future cases. Well, but that's interesting. I mean, the public interest, it seems to me, would be deferring to the government for these international relations. I mean, it's hard to see how the public interest is served by the courts stepping in to international relations issues. Oh, I don't agree at all, Your Honor. Certainly, this court is not supposed to be involved in international relations, but this court is supposed to be involved in construing the treaty and in, as the court said, in review cases. Right, but if Judge Freedman's hypothetical where we've said, okay, you're wrong on the law, but maybe we do think it's a close question or we want to preserve it for someone else to look at it, I mean. I think that would be appropriate for the reason Your Honor says, so that, for example, Dr. Toledo would have the opportunity to seek petition for rehearing or to file a cert petition. I think that there is no significant harm to Peru or to the public, and in fact, I think it's to the benefit of the public to have this issue addressed fully. Can you point us to any case where a panel did that, where a panel thought no success on the merits, but still the stay is justified? No, but I'm also not aware of any case where a court has considered that question and come down on the side of we are precluded from doing that. What is the current status? I know there's been a lot of movement, and I was kind of trying to follow that. I guess there were briefs that were due in the extradition court last week. Is that correct? Yes. So where does that stand right now? That is pending. That is a motion by the government to revoke bail and remand Dr. Toledo into custody until he is extradited. The government's reply brief is due this afternoon, so that has not yet been filed, and then a hearing is set for the 9th. Sorry, I guess I haven't been following that proceeding enough. So what is the issue that's being debated as to that? So the issue is for the last three years, Dr. Toledo has been out of custody, although subject to electronic monitoring and so on. And the issue is in the event that there were not a stay and the extradition were moving forward, the government wants him immediately taken into custody while he waits for Peru to make their plans to come and retrieve him. And the question is whether that's appropriate or whether it should wait until Peru's representatives are here and he can surrender with the marshals, which is what pretrial services has recommended. I see. So if we grant a stay, then that becomes moot, but if we don't grant a stay, then that proceeds, it sounds like. I would hope that that is the case. I don't know what the government's position would be. I don't know if they would still want him. What is your anticipation for what? It sounds like there's a hearing on the 9th, so that's Thursday. Yes. And do you have any anticipation of how long it would take? Who's deciding that? There's a court? Judge Hickson, the extradition judge. And based on his typical methods, my guess is he would decide that day. I see. So we may have a decision on Thursday as to whether or not he could be taken into custody, and do you have any anticipation of how long after that would the extradition actually take place? I think that might be better answered by the government. In my past experience, even when the government has said we are going to try to move things quickly, the person has spent at least two weeks in custody. Before they would be extradited? Yes. And what's your position on when this case would become moot? It would become moot once if Dr. Toledo is in Peru, but not until then. If it's all right, I'd like to reserve the rest. Thank you. Great. Thank you. Good morning, Your Honors. May it please the Court. My name is Mary Jean Chan, and I represent the United States in this appeal. With me at council table is Christopher Smith, Deputy Director and Senior Counsel of Multilateral Affairs of the Department of Justice's Office of International Affairs. I'd like to start off with two things that I don't think actually are in dispute in this case. First, the language of the treaty nowhere refers to what the parties have been calling an orden de inquisimento. It doesn't say anything about, quote, unquote, formal charges, and there's no definition of what a charging document is. So I did want to ask you, and I don't mean to cut you off, but the concession or the claim was that the government has conceded that this was formal, that this means formal charges. I hadn't understood that. What is the government's position on that? There is no such concession. Okay. To your point, it's not in the treaty, but it does seem to creep in in some of the case law. No, actually, we wouldn't agree that it is creeping in in the case law. It's certainly not in the treaty. The treaty has very general language, which says charging document. What's also not disputed is really that the prosecutor's decisions, which were then superseded by the accusation fiscale, are charging documents, and I think that this is really not something that's disputed. If you look at the extradition request, it contains these documents. They contain the charges that the prosecutor's office in Peru is charging Dr. Toledo with. They include the evidence that supports these charges. They are filed with the judiciary, in that case the judge of the preliminary investigation, and they trigger the defendant's rights to interpose certain defenses, like contesting the evidence. As with the accusation at a preliminary hearing, moving to dismiss the charges. By any other name, these are charging documents, and Grinvig Schein, the Supreme Court, very specifically said, essentially, that a rose by any other name smells just as sweet. In that case, it didn't matter whether the document in Russia was called a warrant. It functioned as a warrant, and therefore it satisfied the treaty's requirement for a warrant. Similarly here, these two documents, the prosecutor's decisions and the accusation fiscale, are charging documents. They compare certainly very favorably to the United States complaints, information, indictments, in the functioning as a charging document, and they should suffice for the treaty, under the treaty. There has been no concession by the government. Let me, okay, so thank you for clarifying that. What do we do? How do we reach it? Is the government's position that this is unambiguous, that these are charging documents, or is it ambiguous, but the deference that we would give to Peru here and really to the executive branch is enough for us to support this as being covered by the treaty? We don't think it's ambiguous, but to the extent that it isn't defined, yes, there has to be deference. It has to be deference. It's very clear under the Supreme Court's case, Sumitomo, that there has to be deference to the shared understanding here between the Peruvian Supreme Court, the Peruvian government at large, as well as the United States State Department, who negotiated this treaty, as to what the terms of this treaty they negotiated mean, unless there is extraordinarily strong contrary evidence, which there doesn't exist in this case. It's not in the language or structure of the treaty. It's certainly not in the ratification history of the treaty where the United States' technical analysis, which is submitted to the Senate at the time, specifically said what was contemplated was a range of charging documents for the United States, the complaint, the information, the indictment, not simply one single charging document. In making that determination, what do we rely on? Do we rely on—so this was ratified by the United States— Correct. —by the Senate. Do we rely on the U.S. version of that document for the language, or do we look to the— I mean, there's also a Spanish version as well, right? Which controls? I think for us we have to look at the United States English version, but I think it's important that we can also look to the Spanish version and certainly the interpretation by the Peruvians, our partner in this treaty, to what the terms mean, especially when there is any room for interpretation, as there arguably is here because it isn't defined what a charging document is. We don't think it is really arguable. That's why I'm wondering whether we need to find that it's ambiguous because it isn't well defined. I don't like to find ambiguity. Right. But this might be the case where—and that goes more to the interpretation of this treaty going forward, but if we find it ambiguous, it seems like the rules of construction would still favor the government's position here. Absolutely, but I don't think you should find it to be ambiguous. The words of the treaty are charged with in Article I and charging documents in Article VI. And you think it's unambiguous that these are charging documents? I think that those are—that is unambiguous, yes. But to the extent that the court has any doubt, then it must defer to the parties unless there is extraordinarily strong contrary evidence, which, again, there isn't here. The best that Dr. Toledo's team is able to come up with is the Imami case from this court. But that case actually supports the government's position, which is shared by our Peruvian counterparts. It really analyzes the Article I language charged with, and it's consistent with the position that's being taken by the parties here, says that that means something very general, an accusation sought for prosecution. That is the position that is being taken here by the two negotiating parties, Peru and the United States. And any sort of further extrapolation is just an extrapolation that certainly can't be held to the parties. I mean, Peru, in negotiating this treaty, I don't think can be held to be presumed to be familiar with circuit-level authority, and not just familiar with circuit-level authority, but not the holding, some extrapolation of the holding that isn't actually a necessary reading of that case. Can I ask you about the six-year? So is it true – I hadn't picked up on this – that the accusation was – that that was finalized six years ago? Is that right? Maybe I misunderstood the argument. No, no, it was filed. So just as a chronological matter, there was the prosecutor's decisions. And that was six years ago? That was – actually, it was in 2018. Okay. Sorry, 2017. 2017. So, yeah, it really was six years ago. And then after that, you get a hearing? That's the next step? You go before the judge and there's a hearing to move it to the final phase? I don't believe that there's necessarily a hearing. So, again, the Supreme Court has said we shouldn't try to become experts in Peruvian criminal procedure. But if you look at the code – No, I understand. But I'm pressure-testing this because it is a bit odd that this has happened in six years and we haven't – in six years there hasn't been a movement from kind of the middle category to a more formal – whatever you want to call it. Well, there has been movement, Your Honor. So, in 2017, the prosecutor's decisions were filed. And basically, very shortly thereafter, Dr. Toledo left Peru. He fled Peru. Whatever word you want to use, he was no longer there for this to proceed. And that surely delayed things. But then there was a proceeding where there was more formalization, continuing investigation by the Peruvian authorities. And then in 2020, they filed what is called the Acusación Fiscal. That is another stage in the criminal procedure. And those are the two documents that are filed, actually, by the prosecutor's office. Why did it take – and then they didn't actually file the Acusación with us until pretty recently, like two years passed or so before – between when it issued and when it came here. Is that right? What they did was they immediately let the United States know, but they were then translating it  And this Acusación Fiscal isn't just a two-page document. It's not like one of the United States indictments, which can be fairly short, even if it's many charges. This is thousands of pages that have to be officially translated and then submitted through the State Department to supplement the extradition request. But still, it took, like, two years to do that? I don't know that it took two years. The Acusación was filed in August 11, 2020, and then the United States supplemented their extradition request with containing the translated Acusación Fiscal in August 2021. Oh, one year. Okay. I think that, you know, these periods of time seem lengthy, but there's lots of layers of bureaucracy, and there's also a lot of layers of review that go to all of this. So could I ask you, though? I mean, even if you're right that this is a formal enough charge, it seems like there are still a lot of steps that needs to happen before he could actually be put to trial in Peru, or at least a major step. A court has to decide this is going to go forward to trial, right? That's the charge that they think needs to happen. Well, that's true in the United States. After an indictment has been filed as well, there has to be resolution of motions to suppress and motions to dismiss before there's actually a trial date set. And the Ordin... I guess I'm just trying to understand what is the urgency here. So it seems like things... Okay, I thought it was two years, but maybe it's one year, so it took a year to translate. It's been sort of plodding along, and we're not even at the point where he needs a trial. So what is the problem with granting a stay and letting this play out here while that plays out in Peru? Because I'm not sure it makes any difference. Well, I think it does make a difference. It makes a big difference, for example, to our Peruvian counterparts who have been waiting for him to be transported back to Peru. But that's part of my concern is... Yes. ...I don't doubt that it matters to them, but if it matters to them that much, how come they haven't taken the step to get this more formalized? I mean, that seems to be the disconnect here is... And I get your point, which is I don't want to impose kind of U.S. procedure on this, but if we were sitting here and saying, oh, the indictment was six years ago and we haven't even progressed to a trial, I think we'd all be shaking our heads in the United States saying, well, is the government really pursuing this or not? And so how does that enter into this? Sure. Let me first go back to the criminal procedure code of Peru and just look at the two orders that have to occur. After the accusacion fiscal, the judge of preliminary investigation has to issue the orden de inquisimiento, which is what they're calling the formal charge, and that is really a referral to the criminal court to set a trial date. That criminal court then sets a trial date, which can be no sooner than 10 days, but is supposed to be as soon as possible. These things then are very quickly related to the trial, and the trial cannot really happen without the defendant. So it makes sense that Peru has not gone ahead and issued the orden, the two ordens, and got that process going because they don't have the defendant. Because they would have 10 days to... Although I assume they could try him in absentia. Well, I actually don't know what the rules regarding trial in absentia are in Peru, but from, again, my perusal of the Peruvian criminal court procedure, we're not talking about a charging document at that point. We're talking about orders for trial that might be similar to, for example, a trial order here after the motions to dismiss have been established and there's a trial date set, and it has to happen pretty quickly. And is that in the record here that we have, what you just said about it triggering essentially a 10-day period? No, no, it's in the criminal code of procedure, which, again, if you... Does anybody... Do we have a declaration on that or anything, or do we just have to go look at that ourselves? I think you'd have to look at that yourself. There is a lot in the record about what an acusación fiscal is, that it is a charging document. With respect to the state order, I don't believe there's been much submitted as to the timing and the urgency of this. Obviously, there's been some time that's passed, but there's a lot to review here, and that takes time if you want to do it carefully. In fact, the State Department, in issuing and approving, finally, the extradition and the certification was sent to the State Department. They've now issued the warrant for surrender. In the explanation that they sent to Dr. Toledo, they explained that they had reviewed everything, all the records that were in the direct extradition request. The State Department has issued a warrant. That's what's being reviewed in the proceeding right now? No. Oh. No, sorry, sorry. I'm sorry to mix things up. So what is being reviewed here is very limited. It's just simply Judge Buehler's denial of... I'm referencing that there's another proceeding going on before Judge Hickson. Correct, yes. Is that what you were referencing, the warrant for surrender? So it's related to it. After the certification of extradition that Judge Hickson sent to the Department of State, the Department of State had to look at a whole separate kind of considerations to determine whether it would finally decide that Dr. Toledo should be extradited to Peru. They finally, in the end of February, decided after reviewing all the documentation, including the litigation in the extradition courts, that that should occur. Once that occurred, then the United States went back to Judge Hickson and asked for a review of Dr. Toledo's bail, to revoke that bail so that he would be returned into custody. Once he's returned into custody, then what can be effectuated is the extradition order that has been now determined by the Department of State. So there's a hearing on Thursday before Judge Hickson, and do you share the understanding or anticipation that the decision on whether to revoke the bail might be decided on Thursday? We're certainly hopeful that that will occur. Not on Thursday, shortly thereafter? Unless Judge Hickson decides that he can't go forward because he's waiting for this court to come forward with something on the stay. Because we think those two things are separate, but it's possible that Judge Hickson could be persuaded by that. And so what would the anticipation be after that? Do you agree that it's usually two weeks then? So bail is, let's say bail is revoked, Toledo is then taken into custody, and then it's, what, two weeks before he would be sent to Peru? I can't put a firm date on that, but I think that if there's no legal impediment, the government would work quickly to try to extradite him to Peru. So, again, I can't say that it would be two weeks, one week, more than that, less than that. But I think that if there's no legal impediment to it, then there would be expedience. If we were to agree with the government on the underlying position in this case, should we address that in a merits opinion or should we address this in the context of denying the motion to stay? Or do you care? We care. I think that you should deny the motion for a stay, and you can talk about why in terms of the part that is the likelihood of prevailing on the merits. Why is that so much more preferable to you? Because I think that the way I understand this process to work is that it would take quite a bit of time. If we issue an opinion, then presumably you have to wait for the mandate to issue and the en banc proceedings to take place. Correct. And what do we do with the Supreme Court? If we deny the stay, then the government's under no obligation to wait for the Supreme Court. Should we entertain some sort of an administrative stay to allow the Supreme Court to weigh in? I don't think so. I think that our merits here are extremely strong. And as we all know, the likelihood of any certain— But the irreparable harm, I mean, I agree with you. If the merits are that strong, that might be dispositive. But the irreparable harm here is pretty strong too. Well, the irreparable harm is just that— Peru's not going to give him back if he's extradited. And then that moots out the case. So that's pretty strong irreparable harm. Why shouldn't we proceed cautiously in those circumstances? I think because under the Niken factors, we have that as one factor, but the merits of prevailing or the merits of the action are extremely strong as well as the public interest here. And here we have extremely strong public interest in this moving forward. There is a prosecution that has been pending in Peru. It's been pending for a long time. We have issues, as we always do, when there are delays with witnesses and whether they're still around, frankly. And those all go to the proof. It doesn't mean that necessarily Dr. Toledo will be convicted if he goes to Peru, but he will be tried and he will be able to have a resolution to this. And the Peruvian government and the prosecutor's office can bring an end to this prosecution. So there's an extremely strong public interest in this proceeding post haste. I wanted to just note that I was a little troubled by the approach in the response to the stay motion that said this is exactly the same as last time, you should treat it as rehearing, when last time in responding to the stay, you argued that because the State Department hadn't made a decision, there was no likelihood of immediate harm, and now that's a very different situation, you're making a different argument. I'm not quite sure why you argued everything's exactly the same under that circumstance. Your Honor, I believe that we weren't arguing that everything was the same. We were arguing that with respect to the factors as to the merits. Well, you said the irreparable harm calculus has not materially changed, but your argument had to be entirely different than last time where you said the reason there's no irreparable harm is because the State Department hasn't made the decision. Your Honor, I'm sorry if there was tension with those two arguments. Obviously, we were working very quickly in order because this came down pretty quickly, and we, for example, notified the court of the State Department's decision the day it happened, and I believe that some of the stay motion litigation occurred shortly thereafter. So if there wasn't perfectly careful review, I apologize for that. But we think that the calculus ultimately is that we never really contested that there would be irreparable harm, whether it was imminent or not. So in other words, we weren't—my belief is that when we initially argued that there shouldn't be a stay, we weren't arguing that there wouldn't be irreparable harm to Dr. Toledo. We did argue that it wasn't imminent because it hadn't been decided yet. So I think our position now is that we still agree that there will be irreparable harm, so that in some ways hasn't changed. It's more imminent now, but we always agree that there will be irreparable harm if there was a denial of stay. The real issue is whether there would be any likelihood of prevailing upon the merits. We don't think that there was any change there in the calculus, and so we didn't think that anything should really, really be changed, and therefore it is in more the vein of a motion for reconsideration that we think should be denied. We think that there also, you know, to the question of if you don't think that there— to affirm on the merits, then that, I think, really under the stay calculus means that there is no likelihood that they would prevail. But we have this sliding scale standard in our court, and you seem to have embraced it. You briefed it as if that was part of the standard. Yes. And that is a close question, not likelihood of success. And so if this treaty is ambiguous and we think that it's a close question, it seems like under that standard it is possible, at least theoretically, to think you're wrong but also think it's close. Well, Your Honor, but it's a little like— Sorry, think you're right, think they're wrong. No, I understand. But it's like Schrodinger's cat, which is it might have been a possibility, but once you've decided, it's one thing. So there's no likelihood of success on the merits. It has been decided one way or the other. And so whether it was some thought process that went into it doesn't mean that there's any likelihood. It's been decided at that point. And I think, furthermore, even if there's some ambiguity, the Supreme Court's principles for interpreting a treaty when there's ambiguity are so strongly in favor of fairing with government. You must defer to the government's view about this, the negotiating parties' treaty for this. Under Factor v. Lebenheimer, you must interpret the treaty in a way that enlarges the rights of the parties. And here, this is a bilateral treaty. Anything that you hold here with respect to Peru will also be held and also equally applies to the United States here. We anticipate a whole range of charging documents that would be sufficient under this treaty for the United States. And it would not make sense to then sort of cabin Peru to a single document that is nowhere mentioned in the treaty. So for all those reasons, even if there's some ambiguity, the answer should be very, very clear. And so it shouldn't be a difficult question. And even if it were a difficult question, once this court has decided, there is no more likelihood of success on the merits because that likelihood has dissipated with this court's decision. Thank you, counsel. Thank you very much. Do you have time for a rebuttal still? I'd like to address two things. One is that I believe the government is picking and choosing in the factors that the Supreme Court says should be considered in interpreting an ambiguous treaty. Yes, the court does say that you should give weight to the State Department's interpretation, but Factor also says that the State Department's interpretation is not conclusive and that you also look to regular statutory interpretation means like looking at the way that this treaty is different from the previous versions, looking at the fact that they added this charging document requirement. You also apply the statutory interpretation rule that you presume that the negotiators are familiar with precedent, and I agree. The negotiators in Peru probably are not familiar with IMAMI, but the negotiators in the United States were, not only because they were presumed to be, but because there is an unrefuted declaration in the record saying that they were. So that's the first thing I want to address. The second thing is I just want to make sure it's clear that these proceedings have not in any way delayed the proceedings in Peru. The fact that Peru has taken so long to carry out their investigation is not because Dr. Toledo is in this country. It's because they're taking a long time. If anything, they've benefited from his absence because they've been able to spend that much more time doing their investigation. As to the accusation, it is not the case that if Dr. Toledo were in Peru tomorrow, there could be an order of prosecution tomorrow. My understanding is that the accusation is delayed kind of indefinitely because the prosecutors are also seeking to obtain charges against some companies in Peru that they believe are involved in the bribery scheme. They asked for it to be severed. The court said no. And so the entire question of whether charges will be brought can't even be heard yet, much less beginning a trial. Do you agree, though, with this idea that if the next level of charge issues that basically a 10-day period would be triggered? I do not. That's not my understanding at all. I'm not familiar with that, and I certainly would be shocked to learn that that applies if the person is out of the country. They have other recognitions of delay based on someone's fugitive status, and I would think, although I don't know off the top of my head. But I think the government is saying part of the reason that your client needs to go back to Peru is because then they can issue this charge that then triggers the 10-day period. He doesn't need to be there for that, and I believe that the declaration is— Well, but if they issued the charge and it really triggered a 10-day period— It doesn't. That is not my understanding at all. And I would just say again that Peru has made it clear that they have not been in any hurry. They started investigating this case in 2017, and they still haven't even gotten it through the intermediate stage. I have a question about being in a hurry or not being in a hurry. Perhaps it goes to the harm issue, but is there anything in the treaty that says somebody has to be in a hurry? I mean, my understanding of the investigation is that document is 1,300 pages, right? And this is a complicated fraud and bribe scheme that involves corporations and individuals and activities that go on in various countries, correct? Yes. So to rush an investigation like that, you'd be here probably arguing that this investigation was rushed, correct? Yes. Okay. And there's nothing in the treaty that talks about how long it should take to go forward. So my question to you is the prosecutor issued the charge, and then they spent the time to do the investigation, and all of those documents were put together and sent as part of this request. So how is that not a charging document? Well, of course, I would take issue with calling it a charge. It's not. The first two decisions are notices of the initiation of a preliminary investigation. That's what they're called. That's what they're for. Their purpose is to ask the judge to take someone into preventive detention so they have time. Like an arrest warrant? Yeah. Okay. So they have time to do their investigation. Right. Now, at the time that we had our hearing in front of Judge Hickson, And so how would this not be similar, the 1,300 pages of investigation, how would that not be similar to a complaint in the United States? So that's a different document. That is the one, the accusation, the accusation fiscal from 2020. That's several years later. Right. The difference, I think, is that in Peru's system, the way they have established their system, that is a preliminary document that seeks permission from the judge to move forward, which the judge grants by issuing the charging document. And I think we do need to recognize that that is how that system functions. Thank you, both sides, for the helpful arguments. This case is submitted. And I think we should take a five-minute break before the last case. So we'll take a five-minute break and come back.
judges: FRIEDLAND, NELSON, Cardone